Good afternoon, your honors, and may it please the court, Deputy Federal Public Defender Michael Parente on behalf of the petitioner Donald Millwee. I'll endeavor to reserve five minutes for rebuttal, but I'll keep my eye on the clock. Donald Millwee was sentenced to death by a jury that had a grossly misleading picture of his upbringing and no information whatsoever about his serious mental impairments. The California Supreme Court unreasonably denied Millwee's claims of ineffective assistance of counsel on the ground that they failed to state even a prima facie claim for relief. Because that conclusion was unreasonable, this court can review his claims de novo and order the grant of habeas relief, or alternatively, an evidentiary hearing to further develop the record on his claim. The state relies heavily on two instances in the transcripts in regards to Millwee's ineffective assistance of counsel on the mental health issue, which is the certified claim. The state relies heavily on two instances in the transcripts that show that counsel retained an expert before trial. So I wanted to start by discussing those. The first instance that we have in the record of that is with Millwee's guilt phase counsel, because in this case, he had separate counsel in effect for the guilt and penalty phase. They divided their responsibilities, and that's clear from the record as well as trial counsel's declaration indicates. So the first reference we have, which is SCR 1-7, is his guilt phase attorney discussing, among other experts, the possibility of a psychiatrist. Because, again, I think in context, if you read that, it shows that counsel is considering a psychiatrist potentially for guilt phase issues. It certainly doesn't rebut a prima facie claim that counsel failed to investigate a psychiatrist for the penalty phase. Then we turn to the penalty phase, and we do have attorney Driggs, who is the attorney responsible for the penalty phase. He also is referring to making reference that he's considering a psychologist. But this is three days before the penalty phase is to begin. So just by the defense's penalty phase is to begin. So just by the fact that counsel is three days prior to his defense presentation, the transcripts show anyway, he still doesn't know whether he's going to call a psychiatrist. And we also know that he doesn't have reports yet because he's telling the court on the record, I won't be able to get the DA any reports this week. That just cannot happen. So that already is indicative of deficient performance with respect to the mental health, because we know from the Supreme Court's decision in Florida v. Nixon, from this court's decision in Beemore v. Chappelle, that counsel has a duty to investigate the penalty and guilt phase in conjunction. So the fact that the first reference to any sort of penalty phase psychologist is happening three days before the defense presentation is an indication of deficient performance. Is your reading of the record that there really was no examination at all? So it's not just that there wasn't a report, but there really was nothing? My best reading is that at most there would have been maybe a cursory interview of some kind, but definitely no reports. I've seen no reports. There's no reports in the record. So any examination that did occur in this case would have been ill prepared, cursory and inadequate for preparing for the penalty phase. We also know that counsel was not prepared for this case in terms of a psychiatrist because he says on the record, and I'm still referring to Driggs, the penalty phase attorney, he says this is not the typical case for a psychiatrist. And we know from his declaration that it's his first penalty, it's his first death penalty case. It's also true for Valenzuela. He says that in the pretrial transcripts. But this, for anyone with any experience whatsoever, any competence whatsoever in death penalty cases, this is a standard and very typical case to have a psychiatrist based on what counsel knew. Also, the rest of that quote goes on to say something like he's not schizophrenic, but in fact, we have reason to think he had schizophrenic symptoms, correct? Yes, we know that he has delusions. We know that he was suffering, according to Pablo Stewart, from an extreme emotional delusion at the time of the offense. We know that he was suffering from post-traumatic stress syndrome. We know from, and this is going on from just going back to what counsel knew, he knew that there was a history of family illness on both sides of the family. He knew that Millie had suffered family trauma, that he had a witness saying that Millie was suffering blows to the head at age nine from his father. He had a neighbor, a report from a neighbor saying that he saw Millie being chased by a rifle outside the home and frequent arguments. He had witnesses saying that Millie was drinking alcohol from age seven, whiskey, to be like that. Are there any other references to an expert other than the two that you mentioned? No, Your Honor. Those are the only two references that we have in the record to an expert. There are no other references that I'm aware of, and there's none that a respondent has brought to my attention. So I think when you go, and then most important of all, I think, Your Honor, counsel had information that a year before this capital crime, 1985, Millie was found unconscious in a field, and he had hospital records from this. And it showed that Millie had a depressed skull, that the area around his brain had been depressed in his skull, and that this included the temporal regions of his brain. This occurs in May 1985. I think it's significant because three out of the five aggravators that the state relies on all occurred in that period after that major significant head injury. So you have, you know, the major aggravation in the case is the incidents, obviously, in San Diego, apart from the capital crime, the incidents in San Diego occur just in the days following the And then you have this, this issue with him making a gesture at a threatening gesture at someone in a park looking for a cat. And then you have the incident where he spilled alcohol, someone spilled alcohol on him, and he allegedly hit the person for no reason after that. All of these events that the prosecution focused on these violent acts, all psychiatrists to explain the how this injury could have affected this man, the jury would have learned that we'll look at this drastic change in behavior that we have, suddenly, he's acting violently, he's acting differently. It's all happening after the head injury, and jurors would have been able to understand, irrespective of everything else that they would have learned about his childhood, they would have learned that adding to that he suffers an organic brain injury, it's not his fault at all. And that that that was reasonably affecting his behavior. And from that, at least one juror reasonably could have concluded that a death sentence was inappropriate. And that's what Milley was presented to the state court, and it was denied for filling the state of prima facie claim for the week. I think that should also be emphasized here that although we do give deference to a summary denial, then also tells us that a Supreme Court summary denial in California Supreme Court says this well, I don't think it's disputed by respondent, that the summary denial means that the court has taken the petitioners allegations and evidence is true, and denied them for failing to state a prima facie claim for release. So what we're asking under 2254 D, is whether the state court was reasonable to conclude that based on all of the evidence Noe had and presented in his two petitions, whether that was a prima facie claim of ineffective assistance. No, we go ahead. Did Mill we, you know, somehow box himself in a bit with his strategy, or maybe his counsel strategy at the guilt phase, because they tried to hit a home run by saying it was an accident that by he killed his mother by accident. He had a problem with his knee and slept and the gun went off. They didn't think that the gun was loaded. And once and the apparently apparently testified on his own behalf and appeared lucid and articulate, and then at the penalty phase, all of a sudden, to introduce this evidence of potentially has mental disorders, brain damage, you know, couldn't the council reasonably thought, well, we're gonna lack credibility. If we go go this route, given the earlier strategy of saying, this was all an accident. No, Your Honor, and we know for a fact that that could not have happened in this case, because no, he was subject to a penalty retrial. So this is this jury that I assume, prosecutor would mention that and mentioned that he this was a strategy. And then he probably would have the he or she would have probably heartened the fact that he used a similar defense for the shooting that occurred two days later, that was an accident, and that they lack some credibility that way. So he decided, the attorney, his attorney and penalty counsel decided not to pursue that. I'm not saying this was maybe the right choice. It's a great choice. But you know, isn't it potentially at least reasonable strategy? Your Honor, no, I think that that would that would not be I don't see really what the strategy would be there to say we're going to focus on guilt after the guilt phase just lost. And that's what this court said, in BMR v. Chappelle, that where you have a weak guilt phase defense, and I think by all accounts, this was a weak guilt phase defense, you're alleging an accident when counsel knew that another accident with a shooting occurred three days later. So the guilt phase defense in this case was weak from the beginning, counsel knew that and BMR v. Chappelle says in those cases, it's reasonable for counsel to instead focus on the penalty phase. So if anything, counsel should have been even more focused on the and I also don't see any conflict because to say that you had an accident is in no way inconsistent with saying that you have a brain injury. I mean, people with severe brain injuries, I assume are just as likely to commit accidental shootings as people who don't suffer from such brain injuries. So there was no there was really no risk that counsel faced that jurors would somehow have an adverse view of his psychological evidence, merely on the fact that he was convicted. It's a foregone conclusion that he was convicted and guilty of this murder. And counsel, none of the evidence that we're presenting here is to show that counsel was ineffective for, you know, not presenting an insanity defense. We're not alleging that this psychological testimony would have undermined the guilt claim. But we are alleging that it's reasonably probable that jurors would have considered this evidence, and that at least one juror would have found it probative as to whether to sentence him to death. And we also know that from the jury note, because this is a case where we know a little bit about the jury deliberations, based on what the jurors indicated to the court, they asked the court during deliberations in the And can we see that report? And this court said in in Mayfield, the on bond case that if we can discern what's happening during the jury deliberations from the record, we can consider that for purposes of prejudice. And here we have that we sense have the smoking gun from the jury that says they were open and willing to consider what a psychiatrist had to say here. They didn't have that evidence only because counsel never had a neuro psych or made any psychological presentation whatsoever. And in fact, the opposite conceded that that's not a factor in this case, jurors heard in closing these mitigating factors about from counsel, they heard that the mitigation mitigating factors about mental health and about substance abuse do not apply here have no application. Beyond that, because we have to view ineffective assistance of counsel cumulatively, we also have to look at what counsel did on the aggravating side, which I think is, is just as bad as the absence of mitigation. So you have an unreasonable absence of mitigation here. But on top of it, what makes the case unique is the amount of prejudicial and aggravating evidence that counsel gratuitously introduced into the case that would not have been there otherwise. So through the father, counsel is introducing that Millie was part of an unnamed number of robberies. This gets introduced during the direct testimony. Then from the same witness, his father testifies to Millie forging 60 to 70 checks from the family to hawking goods out of the family's house to buy drugs. But would there be any witness who would only say positive things about him? It seems like every witness would at least have some positive but quite a bit of negative as well here. So I mean, it seems like he wouldn't present any witnesses then. And maybe that was a choice that we can elicit some good stuff. I'm sure there'll be bad stuff. But frankly, he's on trial for killing his mother. So, you know, additional negative facts that may come out, you know, it's not a big deal. Your Honor, I can't say well, I think in this case, it was a very big deal. But I can't say to answer your question that that there's a witness that there's a witness that would say that knew Millie well, that would say only good things. I can't say that there's a statement that that's a guarantee that there would be only mitigation from this witness, but that wouldn't be an accurate picture of his family life. So we acknowledge that some of the some of the evidence of social history may have included, potentially included other acts, but they would not have been comparable to what counsel introduced. And it's also the has said, or the Supreme Court has said, in cases like Sears and Wiggins, that where there is an deficient investigation, we should expect that sometimes there'll be additional aggravation evidence. This was true also in Rumpia. The juvenile file that counsel failed to look at in that case also included additional acts that the jury would hear. But the court nonetheless found that taken as a whole, the evidence still created a reasonable doubt of a different result had it been presented to the jury. And the difference is here, virtually every negative act, the most negative acts in the record came out through the father. There isn't any evidence that I can point to that would have been worse that would have come out had a complete social history been presented. There's nothing for Millie to hide from here, because the worst evidence was already put into the record by his own lawyer. And the Supreme Court said in Buck v. Davis, that evidence is more prejudicial when it comes from defense counsel's own witnesses, because jurors are more likely to take that as face value than when it comes from the prosecution. So here, defense counsel is in effect relying on the prosecution's primary witness, the father, who is throwing and blaming his son left and right in this case and creating a false, really a false picture of Millie's life. He says, for example, that alcohol was not Millie's problem, tells the jury that Millie had no problem with alcohol. That's a false portrayal from what we know from the record and that could have been presented. He tells the jury that there was no hitting, no nothing going on in the household between him and his sons. We know that's false, but the jury heard only this. They didn't hear the true picture of the abuse that Millie and his brothers suffered. Could I take you back to something you were saying earlier? I know you were discussing that the summary denial standard in California deals with a prima facie case, and it sounded like you might have been suggesting that somehow that made this not a decision on the merits and the relevant sense to the extent that there was the merits denial as well as the procedural denial. But that's not my understanding of how Cullen v. Pinholster treated these kind of summary denials, particularly in footnote 12 of Pinholster. I'm just wondering if you're trying to make an argument that somehow this summary denial is different than a merits denial? No, Your Honor. I want to be very clear about this because I think it's important. I mean, the summary denial is an adjudication on the merits. There's no dispute that this is an adjudication on the merits. It's a merits conclusion that Millie has failed to state a prima facie claim for relief. The distinction I want to draw, is that that is different than deference to a state court. If you were to say this is all the evidence that was developed in state court after factual development and an evidentiary hearing. For example, in a case like CAIR, you had a nine-day evidentiary hearing in that case. So I think it's a different standard when you're saying was the state court reasonable in ultimately concluding and finding that a petitioner was not entitled to relief on the basis of his evidence versus was the state court reasonable in concluding that the petitioner failed to state a prima facie claim for relief. So it does sound like you're trying to make some distinction based on this prima facie component of California's standard. But I just don't see how to read Cullen v. Penholster or really even Harrington v. Richter. These are these summary denial cases that the Supreme Court is treating as a denial on the merits in like the full sense. Well, I can't say that. Penholster acknowledges what the state court decision means and says that you have to evaluate the state court based on what it knew and did. And so I think Penholster is concluding that the petitioner in that case failed to state a prima facie claim for relief. And you think that's different? I mean, so if we understand here that there was a ruling to effect here on both the first petition and the second petition, then are you saying that you think the question we need to answer is a different one than what the California Supreme Court would have been answering? No, I think you're answering, I think at the stage of 2254d, you're asking the same question, which is did Milley state a prima facie claim for relief? And I'm just saying that that's a different question than asking whether he proved he was entitled to relief. It's a presented enough evidence for the court to reasonably conclude or for it to be objectively unreasonable to conclude that he never stated a prima facie claim than it is to evaluate the state court as after they've had a hearing. So that might be kind of theoretically true. But here, by the time of what they call the second petition, and we can talk about whether that's the right way to look at what it was, but by the time of the second petition, the evidence that you want to rely on is basically in the record before the state court, isn't it? Right. And that's why for purposes of 2254d analysis, there is no reason for the court to distinguish between the claims because everything has been adjudicated on the merits. All the evidence we're relying on was before the state court. And everything was denied in the same way as a summary denial on the merits, which means failure to state a prima facie claim for relief. So all of our evidence supporting the together under 2254d because there, it was all before the court and denied in the same manner. There is no need to get past the procedural reasons, though, to allow you to make that argument. And I'm wondering if really the way that this second petition should be viewed is more as an amendment to the first petition and not as a second petition at all. And if we look at it that way, do we have cases on when amendments were allowed in California at that time? No, I apologize. I don't have any, you know, case law or insight on that. I do know that obviously, in this case, no, we didn't move to amend the petition. And the court denied his motion to amend and treated it like a like a second petition. I think, though, whether the court views it in that sort of amendment style versus the second petition, there's still the case that no, he has one federal ineffective assistance of counsel claim in his federal petition. And the state has not met its burden of really distinguishing the state asked the court to procedurally default the ineffective assistance of counsel claim in the federal petition, but merely asked the court to go look at two state petitions to distinguish between, you know, which of these claims is defaulted, which part of the claim is defaulted and which isn't. This is an unusual case, because it's not as though there's just a clean sub claim that was unexhausted and brought back to the state court. The state acknowledges that ineffective assistance of counsel about mental health, and about social history and aggravation from dad. All of that was in fact presented in the first petition that was denied premium merits. So the procedural default question is the state's burden, the burden of proving their default. And here, they've done that only by by passing reference to additional exhibits that were submitted in support of a state petition. And because it is their burden, my position, primary position, is that they simply failed to meet the burden on the record that they've asked the court to be adjudicated on. They've asked the court to rule on this in the first instance. Now, if the court disagrees and finds that the bar applies here, the bar is also not applicable in this case, because Millie can overcome it with cause and prejudice. And Millie has asked for a hearing on this both in the district court and in this court. And so if the procedural default in this case, then Millie would ask for a remand for a hearing under Martinez, so that he can establish cause to overcome the default, assuming the court doesn't find that he has already met that burden with the exhibits and his reply brief, addressing that argument. Here, the record actually on post-conviction counsel's ineffective assistance is just as clear. I mean, the fact that these claims were partially presented, but with no evidence at all, further supports ineffective assistance. We're talking about a post-conviction lawyer who alleges that trial counsel was ineffective for not neuropsyching the client or presenting any psychiatric testimony, who provides no psychiatric evidence themselves and doesn't request funds for psychiatric evidence. So the post-conviction lawyer isn't doing what the post-conviction lawyer is alleging trial counsel was ineffective for doing. There's no strategic basis for that, that I can conceive of. In addition, we know that post-conviction counsel was burdened as go as is in their deck. I don't know how much time the court wants me to spend on that, but there was a lot of personal issues that post-conviction counsel was dealing with in terms of the divorce, in terms of a high risk pregnancy at the time, and it prevented meaningful work on the petition that's all supported by the declarations of post-conviction counsel. But if the court finds that there are factual disputes there, Millie is entitled to an evidentiary hearing to meet his cause burden if respondent wants to cross-examine the post-conviction lawyers. Millie's more than happy to present that evidence in the district court. So on the social history, I also want to address that counsel in this case, apart from the aggravation evidence, which I've already touched on, also counsel's declaration concedes that there was no social report prepared in this case. Wiggins does refer to counsel's duty to prepare a report, and California Supreme Court law has said that Wiggins applies in Lucas at 1987, which is the same, which predates Millie's trial. So counsel in this case did have an obligation to prepare a social history report. One was not even prepared, which on its face indicates ineffective assistance of counsel in terms of the social history evidence. I don't see how counsel could reasonably determine whether to present Millie's social history without even having prepared a report. And also I think on the social history aspect, the court can look to Andrews, where one of counsel's arguments for not relying on a correctional facilities expert was that he would have had to rely on inmates. And I think this goes to the court's question before about whether witnesses in Millie's social history would have been adverse. In Andrews, the court rejected the argument that counsel could have not presented the correctional facility evidence because he would have had to rely on inmates, noting that he could have relied on a correctional expert. And I think the same is true here. Whatever concerns the court might have about whether Millie's witnesses would have provided only positive evidence, well, counsel could have presented that in context with an expert and really avoided that aggravation from coming in. So a social historian was necessary in this case. I see that there's four minutes left on my clock, so if the court doesn't have further questions, I'll reserve the balance of my time. Very well. Ms. Jacobson. Good afternoon. May it please the court. The California Supreme Court recently rejected Millie's claim that counsel was ineffective in failing to investigate and present mental health evidence because the record shows that the defense retained a psychiatrist to evaluate Millie before trial. The defense did an extensive pre-trial investigation of Millie's background, and Mr. Driggs considered presenting mental health evidence in the penalty phase. In the declaration that Mr. Driggs provided to habeas counsel more than a decade later, Mr. Driggs addressed two of Millie's IAC claims, but he did not address the claim that counsel was ineffective in failing to investigate and present mental health evidence. The California Supreme Court could have reasonably determined from these circumstances that Millie failed to rebut the presumption that Mr. Driggs performed confidently. Given the double-deference standard that applies on federal habeas review, Millie's claim should be rejected based on deficient performance alone. But the California Supreme Court could have also determined that Millie failed to establish prejudice. The California Supreme Court could have questioned whether the results of the mental health evaluation would have looked the same in 1989, given Dr. Watson evaluated Millie shortly before he suffered a major stroke in 2000, and Dr. Stewart interviewed Millie after the stroke, and both doctors relied, at least to some extent, on the statements of people in 2000, rather than what some of these same people were telling defense investigators in 1989. The California... Do you think that there's evidence that Driggs ever saw any kind of medical evaluation of the defendant's mental state? I think a reasonable jurist could infer from his declaration and the fact that he completely avoided the subject of the mental health investigation and that trial counsel were working together at the penalty-based retrial that Mr. Driggs did indeed see the mental health evaluation, and that's why he did not address the mental health issue in his declaration. So I think a reasonable jurist could certainly infer that Mr. Driggs was aware of this. Do we have any idea what the mental health evaluation looked like that you think he saw? No, Your Honor, we don't, and it was Millie's burden to establish deficient performance, and California law requires him to put reasonably available... to support his claims with reasonably available documentary evidence, and we know at least four people had firsthand knowledge about what happened in the 1988 psychiatric evaluation, and that would be Mr. Driggs, Attorney Valenzuela, Millie himself, and whoever the psychiatrist was that they retained. But do we even know there really was an evaluation? Well, what we have on the record is Attorney Valenzuela telling the court that he had retained a psychiatrist three weeks earlier and that the psychiatrist told him that it would be a month to a month and a half to... until the expert would have that report completed. The state obviously doesn't have access to the defense file, but what we do have is the record and the California Supreme Court could reasonably infer from that record that counsel's representation to the trial court was truthful. Couldn't that representation have been made before there was an evaluation, though, and perhaps the evaluation never happened? I mean, what was said doesn't seem definitive about whether there even was an evaluation, does it? But whether or not there was an evaluation, it was Millie's burden to address what happened with that. It's possible that Millie refused to cooperate as he did with the alcoholism expert, but we don't know because the defense... Millie did not fill that gap with evidence, so we don't know what happened with the evaluation. But the California Supreme Court could certainly reasonably infer that an evaluation did happen, and for whatever reasons, the defense opted not to present mental health evidence either in the guilt or penalty phase. The results of that investigation may not have been favorable to defense... to the defense. We know from the extensive background investigation they did, there were unfavorable things that might lead to an adverse diagnosis, like that when Millie was seven or eight years old, he guided his brother's hamster with a can opener while his the mental health diagnosis may have been something similar to the diagnosis in Sanchez, a borderline personality disorder or antisocial personality disorder. And although it was clearly not before the California Supreme Court, when it evaluated Millie's claims, Dr. Martel's 2008 report, his diagnostic impression is that Millie had schizoid and antisocial personality traits. So it may be that there's a number of possibilities. Millie may have refused to cooperate, the report may have been adverse to the defense, or counsel could have been rightly concerned about what testimony and evidence this would open the door to. But it was, again, Millie's burden to provide evidentiary, provide reasonably evidentiary, reasonably, excuse me, available documentary evidence to support his claim in state court, and his burden under Strickland to establish sufficient performance. And we know that one of the people who had firsthand knowledge about what had happened, and who was cooperating with habeas counsel, provided a declaration that was conspicuously silent on that point. So the California Supreme Court could draw the same inferences in this case that the Washington State Court did in Gentry versus Sinclair, and that this court found reasonable in Gentry versus Sinclair. Can I ask you about the procedural default issues? So why shouldn't we view this as an attempt to amend the first petition? Because the California Supreme Court denied his motion to amend and deemed it a second state habeas petition under state law, and federal courts are, California Supreme Court's determination on a state law issue binds the federal court. But not if it's not adequate, and I'm wondering what you've pointed us to that would show us what the rules were for amendment that makes this a routine application of what California law would have been about amendments. I don't have a ready reference to that. And again, the state court's determination of state law is binding on a federal court. And so this court can't review. But not if the procedural rule is inadequate under procedural default law. I'm not sure what you're saying. I'm saying that California Supreme Court's determination that the amended petition, what their denial of the motion to amend, and they're deeming it a second habeas petition under state law, that that issue is a state law question, and that the California Supreme Court's determination of its own state law binds this court. You're saying we don't even look at adequate and independent state ground questions? You do on a procedural default, but the question of whether this was an amended petition or a second petition is not a procedural default. The procedural defaults that the court imposed in this case were the timeliness bar and the successive petition bar. And we know from Walker versus Martin that those are premised on the idea that this wasn't an amendment, it was a second petition. It was filed as an amendment. It was filed as an amendment. You could file anything under any name you wanted in the state court, but the California Supreme Court under state law determined that it wasn't properly an amendment and deemed it a second habeas petition. So I'm trying to understand though whether that was the right, whether there was support in state law for treating it that way. And it sounds like you're saying we should divide up what they did into parts and treat some as unreviewable and some as reviewable? I think that's consistent with federal law in that the question of state law cannot be reviewed by a federal court on habeas review. But the question of the independence and adequacy of the procedural bars, which in this federal court. I mean, part of what was said was repetitiveness, actually. And the case cited for repetitiveness is in Ray Miller, in which there was a second petition filed after the first petition was denied. That's not the situation we have here. So I don't really understand why the California Supreme Court in the procedural denial is citing cases in which there was a first already denied when a second petition was filed to address a situation we had here where there was a first petition and an amendment to it. The California Supreme Court cited Miller though, after they decided as a matter of state procedural law, that their attempted amended petition was actually a second petition. We don't see that California Supreme Court's reliance on Miller was an improper site to its own law. Can you explain why the California Supreme Court didn't, if it was so clear that nothing more could be filed, why did the California Supreme Court instruct that it get filed as a second petition and then take several more years to deny it? It seems like there was some uncertainty about what should be done with this attempted amendment. I can't speak to what went on in the California Supreme Court on this issue, but I think this court's questions illustrate that in this case, it makes more sense to go ahead and just consider the merits of the claim under section 2254D, because the procedural default issue is more complex and it would be more time consuming since under the cause and prejudice analysis, this court would have to consider the underlying merits of the IAC trial counsel claim anyway. But I can't speak to the timing of the California Supreme Court's application of its own law. Well, given the abandonment by counsel in the first habeas petition, what's the state's position on why there wouldn't be cause and prejudice to excuse the procedural default? First, we would disagree with your honors description of counsel abandoning Mill Wee. It was a husband and wife team that were appointed to represent Mill Wee, and while the husband apparently stopped working on a case with the petition that the California Supreme Court determined was timely and denied on the merits, so I don't think we have the abandonment issue in this case here. As for the IAC part, our position is that the claim, even in the second state habeas petition, was meritless, and therefore, first habeas counsel was not ineffective in raising it. Right, but that doesn't go to the cause and prejudice issue. I don't think there's anything in the record that would support the state's position that this was an effective appeal, habeas appeal. She didn't develop any psychiatric evidence to present anything. It was just a bare petition, which is likely going to be denied. There's no question about that. And then she said she was having personal problems. She was bedridden for a while. I mean, it's tough to see on this record why that wouldn't constitute sufficient cause and prejudice to excuse any procedural default. We are not arguing that the habeas petition that she filed in the state court was not deficient. Our argument is simply that because the version of the ineffective assistance of counsel claim presented in the second state habeas petition was meritless, counsel was not ineffective in the first petition in failing to file a meritless claim. I'm wondering how you deal with the jury note asking for a mental health examination. I have trouble understanding how that isn't evidence that some juror cared about whether he had mental health problems, which in fact we now know he did. We agree that the jury's question shows the jury was interested in reading a mental health report about a man who murdered his own mother. But if the jury had heard, it's not reasonably probable that if the jury had heard mental health evidence, even that which was developed on habeas corpus in the habeas corpus proceedings, that it's reasonably probable that in hearing this evidence and the prosecutorial response to it, that Millwee would have received a more favorable result. If the defense had presented the mental health evidence, the prosecutor would have been able to highlight on cross-examination the overwhelming evidence he had admitted in aggravation of Millwee's acts of violence, which included, of course, Millwee shooting his disabled mother in the head and stealing her cane and shooting a man in the stomach two days later. The prosecutor could have also asked the expert about other acts of violence, like when Millwee was seven or eight years old. The two crimes you just described, the jury knew about, so how is it worse to hear about it again? I don't understand how it wouldn't have been better to also hear that he had this head injury and had these other mental health problems. Counsel could have presented mental health evidence, but there's more than one way to the evidence that the prosecutor had already presented in aggravation. He could have asked the expert about Millwee gutting his brother's hamster with the can opener when he was seven or eight years old and how his brother was crying at the time. The prosecutor could have asked the expert if these acts were more consistent with an antisocial personality disorder rather than some other mental disease or defect. The prosecutor could have also questioned the expert on Millwee's and coherent trial testimony about how he accidentally shot his mother and how Millwee gave the same justification for shooting the man in the stomach two days later. The prosecutor could have also asked the defense expert about Millwee's substance abuse given that the expert opined that Millwee's psychosis could have been induced by his substance abuse, and the prosecutor would have also been able to rebut the defense expert testimony with the own expert. As the prosecutor advised, if the defense were to present mental health evidence, he would be retaining his own expert to review the report. All that's true, except that this mitigation presentation was exceptionally weak. Even the trial judge said there was basically no mitigation evidence put on at all, and that's what the prosecutor argued at sentencing, that there was no mitigation evidence. So as opposed to no mitigation evidence with some that could have been rebutted, it's hard to see why that was a good strategic choice. The results of the defense's pretrial investigation show there were really no good choices in terms of witnesses, and Mr. Driggs chose to present Millwee's father's testimony even though he knew he was hostile to the defense, because his father's testimony enabled the defense to show that Millwee at one point had great promise, and that Millwee, he was the brightest of the sons, he became a journeyman conqueror at the young age of 17, he had lots of friends, and played in a band in high school. The jury also got to see through the father's testimony that the father blatantly favored one son, Ronnie, over the other sons, and that the problems in the Millwee family started long before the murder. The jury heard that Millwee's brother, Brad, died at a young age, and that Ronnie shot Millwee in the hip in the early 80s, and causing him a permanent disability, and that Millwee and his brother Michael committed a robbery together, and they also heard that Mr. Millwee's father did not take responsibility for the things that went wrong in the family, and instead unfairly blamed Millwee for everything. So through the presentation of the father's testimony, Mr. Driggs was able to argue that murder was the product of a dysfunctional family in which one son was clearly favoring the other sons, and that Millwee's father wrongly failed to take any responsibility for what happened to his sons, and wrongly blamed Millwee for everything. And while the mental health evidence, another attorney may have presented the mental health evidence, the California Supreme Court could reasonably determine that Mr. Driggs's decision to forego the mental health evidence and to present the father's testimony was in the wide range of reasonably professional assistance. And the fact that the trial judge didn't view this evidence, the seasoned trial judge didn't view this evidence as mitigating, as not determinative. I agree with you on that, but when you read the bad episodes that came in, and then at the end, of course, he doesn't ask for mercy, and the prosecutor in the closing argument says, none of his family members are asking for mercy, why should you give it? I mean, that was pretty devastating, I thought, in closing. The father's, while the father didn't directly ask for mercy, he also said that he, even though Millwee had obviously caused him a great deal of pain, he couldn't bring himself to say that Millwee deserved the death penalty. He said he would leave it up to the judge and the jury, and that he didn't believe that anyone deserved the death penalty. So in the end of the day, the father did not give up on Millwee. Well, no, I think he did, actually, because the prosecutor starts off an examination and says, you knew I was seeking the death penalty, and you cooperated with me, right? And he says, yes. And it really showed probably what the father thought, is that Millwee should be executed. Again, the choices in this case, as the results of the pretrial investigation show, there were really no good choices, and every choice had a downside. And I believe the California Supreme Court reasonably determined that the father's testimony about the, he didn't believe anybody deserved the death penalty, in the end, was favorable. Can you address the social history, and what do we make of Millwee's own lawyer later in a declaration saying, you know, there's no reason, strategic reason for not doing a social history, I just didn't do it. I mean, how should we consider that? The counsel's, of course, counsel's own evaluation of their performance is not dispositive. We look at it from an objective standard. And while the defense, while he regretted not retaining a social historian, he did not say that he did not evaluate Millwee's social history. And indeed, in the results of the defense pretrial investigation, that the defense has included in their habeas filings, you can see that the defense did an extensive investigation of Millwee's background. They talked to numerous family members, friends, former acquaintances. They obtained school records, medical records, and prison records. So there was an evaluation of the social history. And also, I would add that Mr. The evidence that was from the pretrial investigation and evidence developed on habeas corpus. And of course, Strickland requires a court to review counsel's conduct from counsel's perspective at the time. And in 1989, a defense that Millwee was the abused, there was no support for a defense that Millwee was the abused child of alcoholic parents. And in fact, Millwee himself said that his mother was a good and caring mother, but his father was always there for him. He said that there was always clean clothes, the house was clean, and they had food on the table. So his father started teaching them carpentry at an early age. And that if they wanted things like boats or minibikes, or vacation, his mother would find a way to give it to him. So Millwee's own testimony did not even support the defense that he was an abused child of alcoholic parents. Are you suggesting that we should understand that it would be reasonable for the California Supreme Court to assume that there was some mental health examination, the results of which were much less helpful to Millwee than Dr. Stewart's? I think we could make the same and the California Supreme Court can make the same inferences in this case that the Washington State Court made in Gentry v. Sinclair. And that is that there was some type of mental health evidence that a mental health expert was retained to evaluate Millwee. And that the person with firsthand knowledge didn't provide, Mr. Driggs, didn't provide any information on that. Are you trying to say that we should assume that whatever that report was, it was worse for Millwee than Dr. Stewart's? I'm trying to figure out what the basis in the record for that is, because it seems like what we have now would suggest that that report, if it existed, would have been something that might've been helpful. And so not presenting it is a bad strategic choice. But it seems like you want us to assume that it's some worse report. What the California Supreme Court could have reasonably concluded from the record is that Millwee did not meet his burden of establishing that the investigation was inadequate because he did not fill in the gaps. He chose not to fill in the gaps about what happened with that 1988 report, if there was an evaluation or what the report has. It's a very similar situation to what we had in Gentry v. Sinclair, where because we don't know what happened with it, we would be speculating about whether it would have looked like what Dr. Stewart came up with in 2001, or more like what Dr. Martel came up with in 2008. So I think the conclusion that the California Supreme Court could have reasonably drawn from this record is that Millwee failed to establish his burden of showing that counsel failed to establish. And did I ask you about Mr. Millwee's mental state now and whether he's competent to be executed at all? We have not litigated that issue, and I don't have any information about what his current status is. We have advised in the past that if counsel wanted to raise a claim that Millwee is permanently incapacitated and would never be able to satisfy the four standard, that the place to do it is in state court. He's 68 years old now. I thought he was born in 1952. He's 68 now. He had a stroke, and he's been a judge incapable of helping his lawyers. It's pretty hard to say that we won't all be here again at some point if we sustain your position on a competency issue that really could be decided now. Your Honor, we haven't, as again, we haven't litigated the issue of present competency under a four standard, and I haven't seen any of the records on this. And the four standard is, I believe, easier to satisfy than the competency to assist habeas counsel. But in any event, we haven't litigated this issue, and the place to start would be state court. Is it something that could be discussed in mediation with our circuit mediators? We haven't been approached about mediation or had any internal conversations about mediation, but our position is the appropriate place to start on this would be the state court to give the California Supreme Court an opportunity to rule first on whether this, a death sentence, is still constitutional. Are we being asked to decide something that's potentially moot, though? It's a little bit hard for us to understand why we should be deciding this if he can't be executed. I don't have an answer to the question about whether it's been moot because this issue hasn't been raised in state court, and we haven't litigated it, and I have not seen any records of his current, what's going on with him currently. And we haven't consulted with his experts about whether he would be permanently, would never meet the board standard. So we, our position would be that we should go ahead and rule on the merits of the claims in the present appeal, and if counsel decides that they want to raise an issue about permanent incompetence under board, that the place to do it would be the state court. And unless this court has any additional questions for me, we would submit on the briefing. Thank you, counsel. We'll hear a rebuttal. Mr. Renners, so first, I heard respondents say that she's not arguing that the state is no longer arguing deficient performance on the cause prong. That's basically the way I understood their briefs as well. I think it's a consistent position for her to take here, but I just wanted to emphasize that I think that does mean that the cause question, as far as cause and prejudice on procedural default, is no longer an issue and really has satisfied the showing of cause by the state's representation. So on prejudice, we would just go back to the merits, which is where are under 2254D really. As far as Gentry, the state emphasized Gentry multiple times. Gentry is distinguishable on multiple grounds. First, Gentry was really a case where there was no evidence at all about the defendant's psychiatric impairments that was presented. So there were no expert reports presented in Gentry in state habeas or federal court. All there was was a request to have him reviewed. The court did know that an expert was retained, but that was it. So it was a very sparse record in Gentry. In comparison here, we know that under Strickland, you have to look to the entire record. I've already mentioned that we have the attorney. I think that the transcripts that the state submits where counsel's discussing the record are already themselves evidence of a prima facie case of deficient performance because, as we said, it shows that the lawyer responsible for the penalty doesn't know whether he's going to call a psychiatrist three days before the first defense witness is called in the penalty case. That is deficient of the DuMore v. Chappelle and Porter v. Nixon. Also, we know that also, unlike Gentry, here counsel's declaration does address family history. And as our expert says, Dale Watson, he says a family history report is required for a competent psychological evaluation. So it's not as though here we have a declaration from counsel that's totally unrelated to any ineffective assistance about what he did for mental health. The fact that he did not prepare a social history report means he could not have prepared a competent, he could not have prepared his psych expert to render an opinion there either. Respondent addresses whether Millwee's evaluation was affected by his stroke. It absolutely was not. Dale Watson, the neuropsych in this case, makes plain that all of his testing was done before Millwee's stroke. And the findings in terms of prejudice are substantial. He's finding a borderline intellectual disability. He's doing multiple screening tests, finding on each of them evidence of organic brain damage. We have Pablo Stewart diagnosing Millwee with post-traumatic stress syndrome. These expert reports also, again, unlike the Gentry case, are prima facie evidence that if counsel had sought an expert report, he would not have found information that was unhelpful. He would have found information that is helpful as documented by our experts. So that further distinguishes this case from Gentry. And I also think generally Gentry has to be read narrowly or it just outright conflicts with Supreme Court precedents. Because in other cases, such as Wiggins, such as Porter, where counsel was not cooperative, there's no affidavit from counsel in Wiggins. Wiggins testifies, his counsel testifies at the state habeas hearing that he doesn't recall whether he got a social history report. So the Supreme Court has granted relief on cases where counsel does not submit a declaration. And it would be unreasonable to expect habeas petitioners to have cooperative counsel on their cases supporting their claims just to get their foot in the door and to state a prima facie claim for relief. A rule like that would contravene Supreme Court precedent and this court's precedents. Also, I think just going to the family issue, trial counsel flagged for the jury in this case. He told them in closing argument, which is the only time he addressed the jury in this case, he said, the Millie family was crumbling long before Esther Millie died. And it was crumbling because of internal problems. He said, everything you have to consider revolves around Esther Millie, Don Millie, her husband, and the family. Because to me, that is where the answer to your question lies, is in understanding that family, that situation. Here, after flagging that information for the jury, counsel never provided that evidence to the jury, never did it. Instead, jurors hear prejudicial testimony from his father when at bottom, they hear that the man that was chasing Millie with the gun when he was nine years old is the man that Millie was abusing for years, reportedly. That's what the jury hears. So it's a complete diametrical reversal of his true family life to what the jury's heard before they sentenced him to death. And the jury wanted to have a psychological report, and they didn't. And that was prejudicial under Supreme Court precedents and this court's precedents. If there are no further questions from the court, I'll submit.  Your Honor, that is a live claim that we believe we could potentially have in this case. I heard counsel for the state saying we have an approach with mediation, but I've never, in my experience, it's not really our role to approach them to mediate our cases. Normally, if they're interested in settlement, they would come to us. If the state wants to take the death penalty off the table in this case, we would be more than welcome for that outcome. All right, good. Thank you for your arguments today. The case is ready to be submitted, and your arguments have been very helpful to the court. Thanks for taking the time to argue today, and we will be in recess. Thank you. Thank you. This court for this session stands adjourned.
judges: Thomas, Friedland, Lee